### VINCENT v. McINTYRE.

1. VENDOR AND PURCHASER—EQUITABLE RELIEF NOT WARRANTED BE-
CAUSE VENDORS MADE BAD BARGAIN.

> The fact that vendors made a bad bargain, by which their hands
> are tied, and, so far as their interest in the property conveyed
> is concerned, they have put themselves at the mercy of the
> vendees, is insufficient ground for granting equitable relief.

2. CANCELLATION OF INSTRUMENTS—LAND CONTRACT—FRAUD NOT
SHOWN.

> In a suit to set aside a contract for the sale of land on the
> ground of fraud and deceit, proofs *held*, insufficient to estab-
> lish fraud.

Appeal from Wayne; Miller (Guy A.), J. Sub-
mitted April 13, 1928. (Docket No. 145, Calendar
No. 33,687.) Decided October 1, 1928.

Bill by John Vincent and another against Anna
M. McIntyre and others for the cancellation of a
land contract. From a decree dismissing the bill,
plaintiffs appeal. Affirmed.

*John E. Pokorny,* for plaintiffs.

*O'Brien & Travis (P. H. O'Brien,* of counsel),
for defendants.

NORTH, J. In this suit the plaintiffs seek the can-
cellation of a contract for the sale of 35 acres of
land. Relief is sought on the grounds of fraud and
deceit. The bill of complaint was dismissed by the
decree in the circuit court, and the plaintiffs have
appealed.

The land in question is located about 15 miles from Detroit. The growth of the city has rendered this property suitable and valuable for platting. The plaintiffs sought by advertising to get in touch with some person capable of placing the property on the market. Upon receiving communications from several parties, the plaintiffs went to Mr. Frederick J. B. Sevald, an attorney with whom they had had some former business relations, and submitted the communications. After giving consideration to these proposals and interviewing some of the parties, the attorney decided none were acceptable. He thereupon suggested to the plaintiffs that he thought the defendant Mrs. Anna M. McIntyre might handle the property successfully for the plaintiffs. The other defendant, Mr. James McCririe, was and is associated in a business way with Mrs. McIntyre. They were brought into contact with the plaintiffs by the attorney. The plaintiffs claim they did not know Mr. Sevald was at that time also under general retainer to Mrs. McIntyre; but Mr. Sevald asserts that he told the plaintiffs Mrs. McIntyre was one of his clients. At the outset of the negotiations the plaintiffs proposed to sell their land on a six-year contract for $1,000 per acre with a down payment of $6,000. The defendants declined to purchase the property on this basis, and later entered into a contract by which the plaintiffs agreed to sell this property to the defendants at the price of $1,500 per acre, the purchase price to be paid from the sales of lots. The defendants advanced as a down payment $2,000, and agreed to place the property upon the market. However, the $2,000 advanced by the defendants was to be returned to them from the sales of lots, and they were also to be reimbursed for any expense incurred incident to surveying and platting

the land and placing it upon the market. The contract covers eight and one-half pages of the printed record and contains the following provisions:

(1) The plaintiffs were to deed their property to the Union Trust Company, as trustee, for the purpose of carrying out the details of conveying title to the various lots when sold.

(2) The initial payment on each lot (not to exceed 30% of the total price) was to be retained by the defendants herein to apply on their expenses and compensation for promoting the sales.

(3) Other payments received from the sales of lots were to be made to the trust company; and of the payments so received 50% was to be turned over to the defendants to apply on their expenses and compensation; but in case a lot was sold for cash the amount to be turned over to the defendants was limited to 30% of the cash price.

(4) Of the money received by the trust company, 10% was to be set apart as a sinking fund to be used in covering the expense that the defendants might incur in improving, surveying, platting or paying taxes upon the land; but the amount of this fund was not to exceed $15,000.

(5) Also of the amounts received by the trust company, 5% was to be retained by it as compensation for services rendered.

(6) The trust company was to retain from the moneys paid to it sufficient funds to retire the mortgage indebtedness of $5,500 against plaintiff's property.

Other than above appropriated, the money coming into the hands of the trustee was to be turned over to the plaintiffs from month to month to be applied on the purchase price specified in the contract. Upon payment in full of the contract, title to any remaining portion of the property covered by the contract was to pass to the defendants herein. As

this contract was first prepared it obligated the defendants to pay to the plaintiffs semi-annually the interest on the unpaid portion of the purchase price at the rate of 6 per cent. per annum; but before the contract was finally consummated between these parties the following clause was inserted therein:

"Nothing herein contained shall be construed so as to require purchasers (the defendants), being second parties herein, to advance or pay any moneys to said first parties or in any manner whatever, other than in this agreement provided, and it is mutually agreed and understood between the parties hereto that the first party is to be paid for his said land and the indebtedness discharged to him out of the moneys realized from the sale of the subdivision lots into which the land may be subdivided."

An inspection of this contract discloses the fact that aside from advancing $2,000 on the purchase price and agreeing to pay the taxes on the land, which in turn were to be deducted from moneys received from the sales of lots, and also agreeing to proceed to subdivide and plat the land, these defendants assumed no obligation whatever. No schedule of prices was agreed upon to govern the parties in the sales of the respective lots. No specified time limit was placed upon the defendants within which they should consummate the sale of this property. In the meantime the defendants were entitled to possession, with the exception of the part of the premises occupied by plaintiffs' home. The record discloses that the plaintiffs are without means to protect themselves from the loss of their property in consequence of the mortgage liens thereon or of accruing taxes.

By reason of the provision in the contract that the initial payments on all lots should be turned over

to the defendants, they have received down payments amounting to $9,659.07. They have also received from subsequent payments on contracts $2,025.80, making a total of $11,684.87. During the same period under the terms of this contract the plaintiffs herein received in addition to the $2,000 down payment $1,144.42 interest for the first six months, and a further sum of $815. The contract was signed March 27, 1925, and the bill of complaint herein was filed about a year later. While there is some uncertainty in the testimony, the record of the sales of lots in the meantime seems to indicate that a total of 78 had been sold. But 15 of the contracts had been forfeited and foreclosed; 27 others had entirely ceased paying; and the remaining 36 appear to have been in force.

From the foregoing recital it is clear that these plaintiffs made a bad bargain. Their hands are tied by the contract, and, so far as their interest in this property is concerned, they have put themselves quite at the mercy of the defendants. But the fact that the plaintiffs have dealt unwisely is not a ground for granting equitable relief. *Brody* v. *Crozier*, 242 Mich. 660. In the bill of complaint their claim for relief is based upon the allegation that unbeknown to the plaintiffs Mr. Sevald was under a general retainer to Mrs. McIntyre; and that Mr. Sevald and the defendants "acted collusively and jointly to deprive the plaintiffs of their just rights." Mr. Sevald, upon being called as a witness for the defendants, testified that at the very first of the negotiations with the defendants, he informed the plaintiffs that Mrs. McIntyre was one of his clients. In view of their conflicting interests, it is unfortunate that an attorney should have attempted to serve both parties, regardless of the fact that in so doing

he may have acted in entire good faith. However, this phase of the record is clarified by the testimony of Mr. Vincent, as follows:

"I couldn't exactly say that Mr. Sevald deceived me when he made this contract for me, (or) that he misled me into signing this contract."

Further, the fact that the attorney had this transaction placed in the hands of a disinterested and reliable trust company for supervision indicates quite conclusively that he was not conspiring with the defendants to perpetrate a fraud upon the plaintiffs. If a prompt sale of the lots had resulted from this undertaking, it is obvious that the plaintiffs would have received substantially a half more for their property than they were asking when they began their negotiations with the defendants. It is simply one of those cases where the plans of the parties involved did not materialize. There has been a resultant loss, in consequence of which the plaintiffs have suffered more than the other parties concerned. But it does not follow from this misfortune that the original contract was conceived in fraud as the result of collusion between the attorney who prepared it and the defendants herein.

The phase of the contract about which the plaintiffs complain most seriously is that governing the payment of interest. While the plaintiffs insist that they supposed the defendants were obligated to pay the interest semi-annually at the rate of 6% on the unpaid portion of the purchase price, in this they are met by the terms of the contract to the contrary and by the testimony of the attorney, who states that this was a matter of contention between the parties, and the plaintiffs thoroughly understood the manner of its final adjustment. The plaintiffs' claim is less convincing than it otherwise might be if

it were not for the fact that when the first instalment of interest fell due they secured the services of another firm of attorneys to assist them in collecting it; and here again the plaintiffs claim they were deceived by their attorneys in the matter of the preparation of a rider which was initialed by these plaintiffs and attached to the contract, and by which the method of making future payments of interest was specified and controlled.

To sustain the plaintiffs' contention in this case, we must find that the record establishes gross misconduct or at least inexcusable neglect of clients' interests by an attorney who for years has been a practitioner in the courts of this State. While we should not hesitate to make such a determination if clearly sustained by the record, on the other hand it is quite as important that the reputation and standing of an attorney in his profession should be carefully guarded as that the property interests of litigants should be conserved. After a careful consideration of the record in the case we are forced to the conclusion that these plaintiffs have not established their claim to a right of relief on the ground of fraud and deceit, and that the circuit judge was correct in his finding wherein he stated:

"The charges of fraud and of bad faith and of secret representation as alleged in the bill of complaint were not and are not sustained by the proofs and the plaintiffs are not entitled to any of the relief prayed for in their bill of complaint based upon any claim of fraud or imposition."

This record does not present the question as to what relief might be granted to these plaintiffs if the defendants should neglect or fail to perform under this contract within a reasonable time; and we do not here pass upon that matter in any way.

The decree of the lower court is affirmed, with costs to the appellees.

FEAD, C. J., and FELLOWS, WIEST, CLARK, MC-DONALD, POTTER, and SHARPE, JJ., concurred.